UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| EFFIE L. NELSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 5:05-CV-0267-C |
| | § | ECF |
| JO ANNE B. BARNHART, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

**REPORT AND RECOMMENDATION**

Plaintiff Effie L. Nelson seeks judicial review of a decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The United States District Judge, pursuant to 28 U.S.C. § 636(b), referred this case to the United States Magistrate Judge for report and recommendation, proposed findings of fact and conclusions of law, and a proposed judgment. This court has reviewed the administrative record, the arguments of both parties, and the applicable law and recommends that the District Court affirm the Commissioner's decision.

**I.    Statement of the Case**

Nelson alleges disability based on symptoms related to diabetes mellitus, asthma, pain in her joints, and major depression. (Tr. 69, 101.) The Administrative Law Judge (ALJ) held a hearing at which Nelson was represented and testified and a medical expert and vocational expert testified. (Tr. 563-85.) Nelson testified in part that she could not work because she is diabetic and experienced numbness and swelling that caused her arms and legs to "give

out" and that affected her ability to grip and hold objects. (Tr. 567, 574.) She further testified that she experienced hot flashes and fatigue and could walk only two blocks and sit and stand for limited periods of time. (Tr. 567, 573-74.) In regard to her depression she testified that she experienced crying spells, headaches, shaking and trembling, insomnia, and auditory hallucinations that made her afraid to be in public. (Tr. 568, 572.)

The ALJ determined that Nelson was not disabled because she retained the ability to perform simple work activity at the light exertional level limited to jobs that would not require contact with the general public. (Tr. 21-22.) The Appeals Council denied Nelson's request for review. (Tr. 4-7.) The ALJ's decision is therefore the Commissioner's final decision and is properly before the court for review. *Higginbotham v. Barnhart*, 405 F.3d 332, 337 (5th Cir. 2005).

## II.   Standard of Review

Judicial review is limited to (1) whether the Commissioner's final decision is supported by substantial evidence, and (2) whether the Commissioner used the proper legal standards to evaluate the evidence. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (citations omitted).

## III.   Nelson's Points of Error

Nelson objects to the Commissioner's final decision arguing that (1) the testifying medical expert, Hellmut Tauber, M.D., incorrectly characterized and summarized the medical evidence in the record and that the ALJ erred by incorporating and relying on the inaccurate testimony in his decision; (2) the ALJ erred in analyzing the limitations imposed by her

2

mental impairments and the effect drug and alcohol abuse had upon her mental impairments; and (3) the ALJ erred in determining that she could perform jobs identified by the vocational expert.

## IV.   Discussion

Nelson's argument that the ALJ erred by incorporating and relying on inaccurate testimony from Dr. Tauber must be rejected. The ALJ is entitled to determine the credibility of examining physicians and testifying medical experts such as Dr. Tauber and weigh their opinions accordingly. *See Greenspan v. Shalala,* 38 F.3d 232, 237 (5th Cir.1994). Even in a case in which the medical expert provides inaccurate testimony or the record indicates inconsistencies between the medical expert's testimony and the medical records, reversible error will be found only when the plaintiff shows prejudice. *Carey v. Apfel*, 230 F.3d 131, 142-43 (5th Cir. 2000). Additionally, the court should not find prejudice unless the ALJ relied exclusively on the inaccurate testimony and there is not other evidence in the record that would substantially support the Commissioner's decision. *Id.*

Dr. Tauber testified in part that he did not believe Nelson had a severe diabetic condition or that she had severe asthma. (Tr. 59, 575.) He acknowledged that Nelson had been diagnosed with depression and bipolar disorder and that she had an extensive history of substance abuse. (Tr. 575.) He believed that her mental condition did not meet the criteria of a listed impairment, that she did not have non-exertional impairments, and that she could perform light work that involved uncomplicated, routine, and simple tasks. *Id.*

Nelson contends Dr. Tauber was incorrect in testifying that an individual with asthma

3

exhibits expiratory rather than inspiratory wheezes and that her asthma was not severe. (*See* Tr. 575.) Whether Dr. Tauber mischaracterized the type of wheezing caused by asthma is immaterial. The ALJ did not rely on Dr. Tauber's testimony; he found that Nelson had severe impairments including asthma. (Tr. 13.) In addition, Nelson's asthma was not disabling; the evidence demonstrates that although Nelson's physicians may have at one time determined that she had asthma, the condition did not pose any limitations that would interfere with her ability to work. By Nelson's own report and based on medical records, her asthma was under good control and there is no evidence that she underwent extensive treatment for asthma. (Tr. 17, 183-84, 484-85.)

Nelson further argues that Dr. Tauber disregarded evidence from Russell Packard, M.D., based on his and the ALJ's incorrect conclusion that Dr. Packard was not one of her treating physicians. The evidence Nelson faults Dr. Tauber for disregarding is a standardized release form published by the Texas Department of Human Services which must be completed as part of the application process under which Texas citizens obtain food stamps or other such benefits. (Tr. 206.) On February 17, 2003, Dr. Packard checked boxes on the form indicating that Nelson could not work due to a disabling mental condition. *Id*. Contrary to Nelson's contentions, the records do not show that Dr. Packard had a treatment relationship with Nelson; rather, the records show that Dr. Packard was one of a number of attending physicians at the hospital and that he supervised Nelson's examinations only a few times. (Tr. 188-263, 200-06.) Nonetheless, the ALJ analyzed the form Dr. Packard completed under the treating physician rule as required by the regulations. (Tr. 18-19.)

4

*See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (2006). The ALJ declined to adopt Dr. Packard's opinion not because he was not a treating physician but because he did not include a narrative explanation on the form, did not reference diagnostic evidence or other specific facts that would support his opinion, and was not specific as to the extent of Nelson's functional abilities. *Id*. The ALJ also noted that an opinion such as that provided by Dr. Packard (that a claimant cannot work) is an issue reserved to the Commissioner. (Tr. 19.) The ALJ was correct; the opinion was an opinion reserved to the Commissioner rather than a medical opinion and was therefore not entitled to controlling weight. *Frank v. Barnhart,* 326 F.3d 618, 620 (2003).

The remainder of Nelson's objections in regard to Dr. Tauber's testimony relate to his assessment of her mental limitations and how they were affected by her alcohol and drug use. Nelson argues that Dr. Tauber was incorrect in stating that an emergency room record from May 2004 indicated that she occasionally used alcohol, cocaine, and marijuana. Dr. Tauber, however, was correct. On the top quarter of the document at issue are notations that Nelson reported occasional use of alcohol, cocaine, and marijuana. (Tr. 489.) Nelson also argues that Dr. Tauber testified that she only experienced episodes of decompensation when she abused drugs but did not identify what episodes of decompensation she suffered when she was taking drugs.

Although Dr. Tauber did not identify when he believed Nelson experienced episodes of decompensation, this omission does not constitute reversible error. (Tr. 575.) Whether Nelson experienced episodes of decompensation is irrelevant because she did not show and

5

the medical evidence does not demonstrate that she met one of the other "B" criteria of Listing 12.04. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04. To meet the "B" criteria of Listing 12.04, Nelson was required to show not only that she experienced episodes of decompensation but that she also experienced either marked limitations in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence and pace. *See id.* With medication Nelson experienced mild to moderate rather than marked limitations in the relevant areas of functioning. (Tr. 21, 189, 191, 274, 278-79, 326, 569, 575-76.) The ALJ did not err in relying on Dr. Tauber's opinion and in determining that Nelson experienced mild limitations in the foregoing areas of functioning. *Id.*

Nelson's further complaints regarding Dr. Tauber's testimony need not be discussed because reversal is required only if the ALJ relied exclusively on the inaccurate testimony and there is no other evidence in the record that would substantially support the Commissioner's decision. *Carey*, 230 F.3d at 142-43. The ALJ relied not only on Dr. Tauber's testimony but also on Nelson's testimony and on the medical records. (Tr. 16-18.) Nelson testified that she took Wellbutrin SR for her depression which was helping "in a lot of ways," her physician prescribed medication for her insomnia that "worked," she understood that the voices she heard were not real, and that medication prescribed by her physicians for her hallucinations had helped because she did not hear the voices as frequently as she did without medication.[1] (Tr. 568, 572-73.)

---

[1] Nelson testified that she still heard the voices but the medication helped a "whole lot" because she heard the voices "regularly before they put [her] on this medication." (Tr. 572.)

Nelson points out that although she testified that her hallucinations were "improved" with medication, she still had them. The medical records show that Nelson reported that her hallucinations were decreased or non-existent while taking medication. (Tr. 189, 191.) In addition, as the ALJ noted, Nelson testified that she sometimes went to the public library by city bus where she read, talked with library staff, participated in a book discussion class, and sometimes worked on a computer. (Tr. 569.) The fact that Nelson was capable of engaging in such activities demonstrates that she was capable of interacting socially despite hallucinations that she claims she continued to experience. Further, any residual effects her medication may not have addressed were accommodated by the ALJ's finding that she was limited to jobs with simple tasks that did not require contact with the general public. (Tr.19.)

Although Nelson supports her claim of disability in part by pointing to a Global Assessment of Functioning Score (GAF)[2] of 45 assigned by consulting psychiatrist on April 18, 2000, the medical records show that she was assigned a GAF score of 60 a couple of weeks before the psychiatrist examined her and was assigned a GAF score of 60 approximately one month after the examination. (Tr. 155-57, 366-67.)  Nearly one year later a caseworker under the supervision of Dr. Packard assigned Nelson a GAF of 55. (Tr. 201.)  There are conflicting GAF scores in Nelson's record, but conflicting evidence

---

[2] A GAF score is an assessment of an individual's psychological, social, and occupational functioning based on a hypothetical continuum of mental health and mental illness. AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 34 (4th ed. 2000) (DSM-IV). An individual assigned GAF scores ranging from 40 to 50 could experience serious to major impairments in social and occupational functioning. *Id*. An individual assigned a GAF score of 60 could experience moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id*.

does not require a finding of reversible error or that the claimant is disabled; the ALJ is responsible for resolving conflicts in the evidence while the court is responsible for determining whether the Commissioner's final decision is supported by substantial evidence. *Masterson v. Barnhart*, 309 F.3d 267, 273 (5th Cir. 2002). In this case, there is more than a scintilla of evidence to support the ALJ's decision that Nelson was not disabled; therefore, it should be affirmed. *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (per curiam).

Nelson's argument that the ALJ failed to apply the proper standard in evaluating Nelson's drug abuse must be rejected. The Commissioner's regulations direct that if the ALJ finds the claimant to be disabled, he must determine whether a claimant's alcoholism and/or drug addiction is a contributing factor material to the determination of disability. 20 C.F.R. § 404.1535. If such a determination is made, receipt of benefits is contingent on the individual participating and complying with a treatment program. 20 C.F.R. § 404.1536. In this case the ALJ found that Nelson was not disabled; therefore, he was not required to determine whether her drug abuse was a contributing factor to her disability. 20 C.F.R. § 404.1535.

Finally, Nelson's argument that the ALJ failed to meet the Commissioner's burden at the fifth step of the sequential disability analysis must be rejected. The ALJ determined that Nelson could perform simple work activity at the light exertional level limited to jobs that would not require contact with the general public. (Tr. 21.) Based on testimony provided by the vocational expert he determined that Nelson could perform the jobs of assembly press operator, folding machine operator, and machine tender, and was therefore not disabled.

8

(Tr. 22.) Nelson argues that the jobs identified by the vocational expert require a worker to engage in tasks beyond those that can be characterized as "simple." She specifically points out that the job of machine tender requires a worker to apply common sense understanding to carry out detailed but uninvolved written or oral instructions and to deal with problems involving a few concrete variables in or from standardized situations.

A vocational expert is called to testify because of his familiarity with job requirements and working conditions, *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir.1995), and the ALJ may rely upon the expertise of a vocational expert in determining complex issues such as whether a claimant's work skills can be used in other occupations and the specific occupations in which they may be used, 20 C.F.R. §§ 404.1566(e), 416.966(e). The ALJ's reliance on the vocational expert's testimony was not reversible error. *Id*.

## V.     Recommendation

Based on the foregoing discussion of the issues, evidence and the law, this court recommends that the United States District Court affirm the Commissioner's decision and dismiss Nelson's complaint with prejudice.

## VI.    Right to Object

Pursuant to 28 U.S.C. § 636(b)(1), any party has the right to serve and file written objections to the Report and Recommendation within 10 days after being served with a copy of this document. The filing of objections is necessary to obtain de novo review by the United States District Court. A party's failure to file written objections within 10 days shall bar such a party, except upon grounds of plain error, from attacking on appeal the factual

findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc).

Dated:   August 15, 2006.

_____
NANCY M. KOENIG
United States Magistrate Judge